**FILED**
CLERK, U.S. DISTRICT COURT

**2/24/2023**

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ CD _____ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

January 2023 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR  2:23-cr-00089-DSF |
| Plaintiff, | I N D I C T M E N T |
| v. | [18 U.S.C. § 1348(1): Securities Fraud; 15 U.S.C. §§ 78j(b), 78ff; 17 C.F.R. § 240.10b-5: Securities Fraud (Insider Trading); 18 U.S.C. § 981(a)(1)(C), 28 U.S.C. § 2461(c): Criminal Forfeiture] |
| TERREN SCOTT PEIZER, | |
| Defendant. | |

The Grand Jury charges:

COUNT ONE

[18 U.S.C. §§ 1348(1), 2(b)]

A.   INTRODUCTORY ALLEGATIONS

At times relevant to this Indictment:

1.   Ontrak, Inc. was a company based in Santa Monica, California, that provided behavioral health services, primarily to members of large health-insurance plans, designed to reduce the insurance companies' costs.  Shares of Ontrak were publicly traded on the National Association of Securities Dealers Automated Quotations Stock Market ("NASDAQ"), a national securities exchange, under the

symbol "OTRK."  Ontrak was an issuer with securities registered under Section 12 of the Securities Exchange Act of 1934 (the "Exchange Act") and was required to file reports under Section 13 of the Exchange Act.

2.   Defendant TERREN SCOTT PEIZER was a resident of Puerto Rico and Santa Monica, California.  Defendant PEIZER was the Executive Chairman (a management role to which the Chief Executive Officer ("CEO") reported) and Chairman of the Board of Directors for Ontrak. Defendant PEIZER founded Ontrak in or around September 2003 and had served as its CEO until in or around April 2021.  By virtue of his relationship with Ontrak, defendant PEIZER had access to material nonpublic information belonging to Ontrak, including Ontrak's relationship with and retention of customers.  As a member of the Board of Directors, defendant PEIZER was a corporate insider and owed a fiduciary duty and duty of trust and confidence to Ontrak and its shareholders.

3.   A stock "warrant" gave the holder the right to purchase a public company's stock at a specific price.  A stock warrant was issued directly by the company.  When the holder exercised a stock warrant, the shares that fulfilled the obligation came directly from the company.  Once the stock warrant was exercised, the new shares operated identically to any other shares and could be held or sold by the holder.

4.   A "Rule 10b5-1 plan" under the Exchange Act allowed a corporate insider of a publicly traded company to set up a trading plan for selling stock that he or she owned.  If the corporate insider followed the requirements of Rule 10b5-1, the trades pursuant to the plan were insulated against charges of insider trading.  Rule

1  10b5-1 required that the corporate insider establishing the plan
2  could not possess material nonpublic information about the company at
3  the time he or she entered into the plan; if the insider did have
4  material nonpublic information at the time he or she entered into the
5  plan, the plan provided no defense to insider trading charges.
6  Additionally, trading pursuant to a Rule 10b5-1 plan provided no
7  defense to insider trading charges if the plan was not entered into
8  in good faith or was entered into as part of an effort or scheme to
9  evade the prohibitions of Rule 10b5-1.
10      5.   A "cooling-off period" was a specified time period,
11 commonly used in the securities industry, during which an executive
12 waited a certain number of days after establishing a Rule 105b-1 plan
13 to begin trading.  Cooling-off periods were used to ensure that
14 enough time passed between when the executive established a plan and
15 when the plan began to execute trades to minimize the likelihood that
16 the executive was trading on the basis of material nonpublic
17 information.
18      6.   Ontrak had an Insider Trading Policy, which governed
19 defendant PEIZER's trading in Ontrak's stock.  The Insider Trading
20 Policy prohibited trading while in possession of material nonpublic
21 information.  The policy defined material nonpublic information as
22 "information that has not been previously disclosed to the general
23 public and is otherwise not available to the general public," which
24 included negative information concerning Ontrak.  The policy stated
25 that information was material "if there is a reasonable likelihood
26 that it would be considered important to an investor in making an
27 investment decision regarding the purchase or sale of [Ontrak]'s
28 securities."  The policy identified certain "categories of

3

information that [were] particularly sensitive and, as a general rule, should always be considered material," including a "material agreement (or termination thereof)."  Ontrak's agreements with certain customers constituted material agreements.  The policy required Exchange Act Section 16 officers and directors, such as defendant PEIZER, to submit Pre-Trading Clearance Certifications to Ontrak's Chief Financial Officer ("CFO") before allowing the officer or director to trade pursuant to a 10b5-1 plan.  The Pre-Trading Clearance Certification required the officer or director to certify "that this proposed dealing was not a result of access to, or receipt of Material Nonpublic Information as described in the Company's Insider Trading Policy."

7.   Cigna was a healthcare and insurance company based in Bloomfield, Connecticut.  Cigna provided health insurance and related products and services for millions of Americans.  Beginning by at least in or about July 2020, Ontrak provided services to Cigna's insured patients under a $90 million contract.  The contract was intended to last for three years, although it allowed Cigna to terminate the contract upon 30 days' notice.

B.   DEFENDANT PEIZER'S ACCESS TO NONPUBLIC INFORMATION REGARDING CIGNA

8.   In or around March 2021, defendant PEIZER stepped down as CEO of Ontrak and became the Executive Chairman and Chairman of the Board of Directors.  Despite the change in title, defendant PEIZER continued to receive nonpublic information about Ontrak, including its relationship with customers on a regular basis.

9.   For example, between in or around March 2021 and in or around May 2021, defendant PEIZER learned, by virtue of his role as

4

Ontrak's Executive Chairman and Chairman of the Board of Directors, that its then-largest customer, Cigna, had raised numerous issues concerning its relationship with Ontrak and that Ontrak was in serious danger of Cigna terminating its agreement with Ontrak, which was nonpublic information that a reasonable investor would consider important in deciding whether or not to trade in Ontrak securities.

a.    Specifically, defendant PEIZER knew the following:

i.    In or around February 2021, Cigna began significantly reducing the number of its members that it referred per month to Ontrak for services; by at least in or around May 2021, Cigna had reduced the number of patients that it referred from several thousand members per month to approximately 50 members per month — thereby substantially reducing Ontrak's potential billings to Cigna;

ii.   Cigna had informed Ontrak, in or around at least April 2021, that its contract with Ontrak would need to be renegotiated (with less favorable terms for Ontrak);

iii.  Cigna had determined that its contract with Ontrak did not result in the cost savings it had anticipated;

iv.   Cigna was concerned that Ontrak was spending funds under the current contract with Cigna too quickly; and

v.    Cigna had halted discussions on any potential expansion of Ontrak's services to Cigna.

b.    Defendant PEIZER also knew that the loss of Cigna as a customer would have a material adverse effect on Ontrak.  Indeed, on or about February 28, 2021, Ontrak's then-largest customer, Aetna, had provided notice that it was terminating its contract with Ontrak. On or about March 1, 2021, following Ontrak's public announcement of

the loss, Ontrak's stock price dropped nearly 46% in value.  As Ontrak's largest shareholder, defendant PEIZER lost approximately $280 million in the value of his Ontrak securities following the announcement of Aetna's termination of its contract with Ontrak.

      c.   Defendant PEIZER also knew that, after the loss of Aetna as a customer, the serious jeopardy facing Ontrak's relationship with its next biggest customer, Cigna, would be of particular importance to investors.

      d.   On or about May 6, 2021, Ontrak filed a Form 10-Q quarterly report with the Securities and Exchange Commission ("SEC") stating, among other things, that "Our business currently depends upon four large customers; the loss of any one such customers would have a material adverse effect on us."

      e.   As Executive Chairman and Chairman of the Board of Directors, defendant PEIZER had direct access to and regular conversations with Ontrak's CEO, who provided him with regular updates about the status of Ontrak's negotiations with Cigna.

      f.   Defendant PEIZER's communications with Ontrak executives and consultants between in or around March 2021 and in or around May 2021 reflected his knowledge and understanding of the deteriorating relationship between Ontrak and Cigna.  For example:

          i.   On or about March 31, 2021, defendant PEIZER described himself as "fixated" on Cigna in a text message to an Ontrak consultant;

          ii.  On or about April 2 and 14, 2021, defendant PEIZER wrote in text messages with the same consultant that Ontrak's management needed to "save Cigna";

iii. On or about April 15, 2021, defendant PEIZER wrote in a text message to Ontrak's CEO: "Please just save Cigna .. then we will get back 'OnTrak'";

iv.  On or about April 24, 2021, in response to an update on the Ontrak-Cigna relationship, defendant PEIZER wrote that "This feels eerily like Aetna" and that "Baby is losing his hair from chemo," which was a reference to Ontrak's potential loss of Cigna as a customer;

v.   On or about April 30, 2021, in response to another update concerning Cigna, defendant PEIZER wrote in a text message to the consultant, "Doesn't sound optimistic"; and

vi.  On or about May 1, 2021, defendant PEIZER sent a text message to the consultant concerning the Ontrak-Cigna relationship saying, "What a nightmare."

g.  By at least on or about May 4, 2021, defendant PEIZER was well aware that Cigna had expressed serious concerns about maintaining its contract with Ontrak and that a meeting with Cigna's Chief Medical Officer – who was managing the Ontrak-Cigna relationship on Cigna's side – had been scheduled for May 18, 2021, to discuss the status of the relationship.

h.  On or about May 18, 2021, during the meeting with Cigna, Cigna informed Ontrak of its intent to terminate their contract by the end of the year.

C.  THE INSIDER TRADING SCHEME

10.  Beginning on an unknown date but no later than in or around May 2021, and continuing through in or around August 2021, in Los Angeles County, within the Central District of California, and elsewhere, defendant PEIZER, together with others known and unknown

7

to the Grand Jury, knowingly and with intent to defraud, devised, participated in, and executed a scheme to defraud a person in connection with the securities of Ontrak.

11.   The fraudulent scheme operated, in substance, as follows:

**Defendant PEIZER Entered into a Rule 10b5-1 Plan in May 2021 and Sold his Ontrak Securities Based on Inside Information that Ontrak was at Serious Risk of Losing its Contract with Cigna**

a.   On or about May 4, 2021, in advance of Ontrak's May 18, 2021, meeting with Cigna, defendant PEIZER contacted Broker A to set up a Rule 10b5-1 plan in order to sell shares of Ontrak valued at approximately $19 million.

b.   According to publicly available SEC filings, defendant PEIZER had previously only sold his Ontrak shares twice since 2003: once in 2008 for approximately $220,000; and once in 2011 for approximately $118,000.

c.   After defendant PEIZER contacted Broker A to set up a 10b5-1 plan, he was informed that Broker A required the 10b5-1 plan to have a cooling-off period.  After learning that Broker A required a cooling-off period, defendant PEIZER declined to set up a 10b5-1 plan with Broker A and instead, that same day, contacted another brokerage company, Broker B, to discuss setting up a 10b5-1 plan with Broker B.

d.   Although Broker B did not require a cooling-off period, Broker B warned defendant PEIZER in an e-mail that not following the industry best practice of a 30-day cooling-off period, together with the "rapid transaction executions subsequent to plan adoption" might "create an appearance of impropriety and call into question whether a plan adopter had MNPI [material non-public

information] at the time of plan adoption." In response, defendant PEIZER insisted that the plan not have a cooling-off period and instead that he be allowed to start selling his shares as soon as possible.

       e.  To obtain approval of the 10b5-1 plan, defendant PEIZER falsely certified to Ontrak's CFO that "this proposed dealing was not a result of access to, or receipt of Material Nonpublic Information as described in the Company's Insider Trading Policy" when, as defendant PEIZER then knew, he possessed material nonpublic information, to wit, Ontrak's endangered relationship with Cigna and the serious risk that Cigna would terminate its contract with Ontrak.

       f.  On or about May 10, 2021, eight days before Cigna informed Ontrak of its intent to terminate the contract by the end of the year, defendant PEIZER entered into a Rule 10b5-1 plan (the "May Trading Plan") through Broker B. The May Trading Plan was in the name of Acuitas Group Holdings, an investment company wholly owned by defendant PEIZER and used by defendant PEIZER to hold his ownership interests in numerous companies, including his Ontrak shares. As part of the May Trading Plan, defendant PEIZER falsely certified to Broker B that he was not in possession of material nonpublic information when, as defendant PEIZER then knew, he did possess material nonpublic information regarding the serious risk that Cigna would terminate its contract with Ontrak. Despite the cautionary advice by Broker B to implement a cooling-off period between the establishment of the May Trading Plan and the sale of defendant PEIZER's Ontrak shares, defendant PEIZER directed Broker B to begin selling his Ontrak shares the next day.

g.   The May Trading Plan was attached as an exhibit to an amended Schedule 13D filed with the SEC by Acuitas Group Holdings and signed by defendant PEIZER on or about May 11, 2021.

h.   Pursuant to the May Trading Plan, defendant PEIZER exercised approximately 686,000 Ontrak stock warrants on a cashless basis, resulting in his acquisition of approximately 585,000 shares. Thereafter, defendant PEIZER began selling these shares on or about May 11, 2021.

i.   On or about May 18, 2021, Cigna notified Ontrak of its intent to terminate its contract with Ontrak by the end of the year. That same day, Ontrak's CEO notified defendant PEIZER of this information.  This information was not publicly disclosed.

j.   Defendant PEIZER continued to sell his Ontrak shares pursuant to the May Trading Plan until on or about July 20, 2021.  In total, the sales from on or about May 11, 2021, to on or about July 20, 2021, resulted in approximately $18,906,000 in proceeds.

**Defendant PEIZER Entered into a Second Rule 10b5-1 Plan in August 2021 and Sold Additional Securities Based on Inside Information About Ontrak's Impending Loss of Cigna as a Customer**

k.   Between in or around May 2021, and in and around August 2021, defendant PEIZER continued to receive information that Cigna was ending its relationship with Ontrak, which was nonpublic information that a reasonable investor would find to be material.

l.   For example, on or about July 15, 2021, an Ontrak consultant sent a text message to defendant PEIZER that Cigna was "really throttling members being sent to us.  It's a trickle at this point."  As another example, on or about August 13, 2021, defendant PEIZER called Ontrak's Senior Vice President and General Manager of

Customer Strategy and Solutions, who was leading the contract renegotiations with Cigna, to find out about the likelihood of Ontrak retaining Cigna as a customer.  On that call, the employee informed defendant PEIZER that he believed Cigna was likely to formally terminate its relationship with Ontrak.

        m.   That same day, on or about August 13, 2021, approximately one hour after his call with the Ontrak employee informing defendant PEIZER that the employee believed Cigna was likely to end its relationship with Ontrak, defendant PEIZER entered into a second Rule 10b5-1 plan (the "August Trading Plan") to further sell his Ontrak shares.

        n.   Prior to implementing the August Trading Plan, defendant PEIZER falsely certified to Ontrak's CFO, pursuant to Ontrak's Insider Trading Policy, that "this proposed dealing was not a result of access to, or receipt of Material Nonpublic Information as described in the Company's Insider Trading Policy" when, as defendant PEIZER then knew, he possessed material nonpublic information including, among other things:

               i.   Cigna's prior notification to Ontrak on May 18, 2021, of its intention to terminate its contract with Ontrak by the end of the year;

               ii.  Cigna's continued reduction in the number of members sent to Ontrak;

               iii. Cigna's disinterest in renegotiating the terms of any contract with Ontrak;

               iv.  That certain Ontrak executives, including its lead negotiator with Cigna, held the view that Cigna would formally terminate its contract with Ontrak; and

v.    That a meeting was scheduled with Cigna personnel for August 18, 2021 concerning Ontrak's attempts at salvaging the relationship.

o.    On or about August 13, 2021, defendant PEIZER, through Acuitas Group Holdings, entered into the August Trading Plan through Broker B.  As he had done in connection with the May Trading Plan, defendant PEIZER again falsely certified to Broker B that he was not in possession of material nonpublic information when, as defendant PEIZER then knew, he did possess material nonpublic information including the facts listed in the preceding subparagraph.  Like the May Trading Plan, the August Trading Plan did not implement a cooling-off period.  Defendant PEIZER began selling Ontrak shares the next trading day after the plan was implemented and increased the daily number of shares sold pursuant to his plan to 15,000 per day from 11,000 shares per day under the May Trading Plan.

p.    The August Trading Plan was attached as an exhibit to an amended Schedule 13D filed with the SEC by Acuitas Group Holdings and signed by defendant PEIZER on or about August 16, 2021.

q.    Prior to Ontrak's public announcement that Cigna had terminated its contract with Ontrak, defendant PEIZER sold approximately 45,000 Ontrak shares over the course of three trading days, from on or about August 16 to on or about August 18, 2021, resulting in approximately $900,000 in proceeds.

r.    On or about August 18, 2021, during the scheduled call that defendant PEIZER was aware of at the time he entered in the August Trading Plan, Cigna formally notified Ontrak that it would terminate its contract with Ontrak.  On or about August 19, 2021, Ontrak filed a Form 8-K with the SEC disclosing for the first time

the termination of its relationship with Cigna.  Following the announcement, Ontrak's stock price fell approximately 44%.

**Defendant PEIZER Avoided Approximately $12.5 Million in Losses through Insider Trading**

12.  Based on the May Trading Plan that defendant PEIZER adopted while he possessed material nonpublic information, defendant PEIZER's stock sales on the basis of material nonpublic information, and the decrease in the price of Ontrak shares following the public disclosure of this information, defendant PEIZER avoided approximately $12,069,000 in losses from the exercise of his Ontrak warrants and sale of the resulting Ontrak shares pursuant to the May Trading Plan.

13.  Based on the August Trading Plan that defendant PEIZER adopted while he possessed material nonpublic information, defendant PEIZER's stock sales on the basis of material nonpublic information, and the decrease in the price of Ontrak shares following the public disclosure of this information, defendant PEIZER avoided approximately $463,000 in losses from the exercise of his Ontrak warrants and sale of the resulting Ontrak shares pursuant to the August Trading Plan.

D.  EXECUTIONS OF THE INSIDER TRADING SCHEME

14.  From on or about at least May 4, 2021, through at least on or about August 19, 2021, defendant PEIZER, in the Central District of California, and elsewhere, for the purpose of executing the aforesaid scheme and artifice to defraud, made, and caused to be made, false and misleading representations to Ontrak's shareholders and the investing public about defendant PEIZER's possession of material nonpublic information about Ontrak's relationship with its

13

largest customer, Cigna, through the execution of -- and filing of,
with the SEC, as attachments to Schedules 13D -- the May Trading Plan
and the August Trading Plan.

COUNTS TWO AND THREE

[15 U.S.C. §§ 78j(b), 78ff; 17 C.F.R. § 240.10b-5; 18 U.S.C. § 2(b)]

15.   The Grand Jury re-alleges paragraphs 1 through 9 and 11 through 13 of this Indictment here.

16.   On or about the dates set forth below, in Los Angeles County, within the Central District of California, and elsewhere, defendant PEIZER, directly and indirectly, by the use of the means and instrumentalities of interstate commerce and of the facilities of national securities exchanges, in connection with the sale of Ontrak securities, employed a device, scheme, and artifice to defraud members of the investing public and engaged in acts, practices, and a course of business that operated and would operate as a fraud and deceit upon a person, in that defendant PEIZER executed and willfully caused to be executed the securities transactions listed below on the basis of material nonpublic information that he used in breach of a duty of trust and confidence that he owed directly and indirectly to the issuer of those securities, to the shareholders of the issuer, and to other persons and entities that were the source of the material nonpublic information:

| COUNT | DATE | SECURITIES TRANSACTION |
|-------|------|------------------------|
| TWO | 05/11/2021 | Sale of 11,000 Ontrak shares at an average price of approximately $30.52 per share pursuant to the May Trading Plan for a total price of approximately $336,190.80. |
| THREE | 08/16/2021 | Sale of 15,000 Ontrak shares at an average price of approximately $23.36 per share pursuant to the August Trading Plan for a total price of approximately $348,144.00. |

FORFEITURE ALLEGATION

[18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)]

17.   Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), in the event of the defendant TERREN SCOTT PEIZER's conviction of the offenses set forth in any of Counts One through Three of this Indictment.

18.   Defendant PEIZER, if so convicted, shall forfeit to the United States of America the following:

(a)   All right, title, and interest in any and all property, real or personal, constituting, or derived from, any proceeds traceable to the offenses; and

(b)   To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

19.   Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), defendant PEIZER, if so convicted, shall forfeit substitute property, up to the value of the property described in the preceding paragraph if, as the result of any act or omission of defendant PEIZER, the property described in the preceding paragraph or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred to, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has //

1  been substantially diminished in value; or (e) has been commingled

2  with other property that cannot be divided without difficulty.

3

4                                          A TRUE BILL

5

6                                    _____/s/_____

7                                          Foreperson

8

9  E. MARTIN ESTRADA                  GLENN S. LEON
   United States Attorney             Chief, Fraud Section
10                                     Criminal Division
                                       U.S. Department of Justice

11  Scott M. Garringer
    Deputy Chief, Criminal Division For:
    MACK E. JENKINS                    MATTHEW REILLY
12  Assistant United States            CHRISTINA MCGILL
    Attorney                           Trial Attorneys
13  Chief, Criminal Division           Fraud Section
                                       Criminal Division
14                                     U.S. Department of Justice
    RANEE A. KATZENSTEIN
15  Assistant United States
    Attorney
16  Chief, Major Frauds Section

17  SCOTT PAETTY
    Assistant United States
18  Attorney
    Deputy Chief, Major Frauds
19  Section

20  ALI MOGHADDAS
    Assistant United States
21  Attorney
    Major Frauds Section

22

23

24

25

26

27

28

                                    17